UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE No. 07-60668-CIV-GOLD/McALILEY

EAGLETECH COMMUNICATIONS INC., et al.,

      Plaintiffs,

v.

CITIGROUP, INC., et al.,

      Defendants.

_____/

ORDER GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS; DISMISSING
WITH PREJUDICE THE FEDERAL RICO CLAIMS AGAINST MOVING DEFENDANTS
AND THOSE SIMILARLY SITUATED; DISMISSING WITHOUT PREJUDICE, AND
<u>REMANDING TO STATE COURT, THE REMAINING STATE LAW CLAIMS</u>

      THIS CAUSE comes before the Court on: (1) the Moving Financial Institutions'

Motion to Dismiss [DE 134][1]; (2) Vincent Anthony Zeccola's ("Zeccola") Motion to Dismiss

[DE 135]; and, (3) Tower Equities Re, Inc.'s ("Tower Equities") Motion to Dismiss [DE 136].[2]

---

[1]

"Moving Financial Institutions" collectively refers to the following Defendants: (1) Citigroup,
Inc. ("Citigroup"); (2) JP Morgan Chase & Co. ("JPMC"); (3) The Bank of New York
Company ("BNY"); (4) Prudential Equity Group, LLC f/k/a Prudential Securities
Incorporated ("Prudential"); (5) Bear, Stearns Securities Corp., Inc. ("Bear Stearns"); (6)
Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"); (7) Herzog, Heine,
Geduld, LLC ("Herzog"); (8) Tucker Anthony Incorporated, n/k/a RBC Capital Markets
Corporation ("Tucker Anthony"); (9) Knight Equity Markets, L.P. ("Knight"); (10) Man
Financial Inc., n/k/a MF Global Inc., ("MFG"); (11) Leesport Bank, as successor in interest
to Madison Bank ("Madison Bank"); (12) Oscar Gruss & Son, Inc. ("Oscar Gruss"); and,
(13) Goldman Sachs Execution Clearing, L.P. ("Goldman Sachs").

[2]

Defendants Zeccola and Tower Equities incorporate to their motions the arguments set
forth in the Moving Financial Institutions' Motion to Dismiss.  In addition, Defendant John
Black ("Black") filed a Motion to Dismiss based on lack of personal jurisdiction, because
the Complaint was untimely, and "for such other and further relief as to the Court appears
just and proper."  (*See* DE 120). On January 4, 2008, I issued an Order Clarifying
Deadlines [DE 121], in which I stated that a response to Black's motion would not be due

The parties filed responses, replies, sur-replies, and sur-sur replies, and the Court held oral argument on June 6, 2008.  In accordance with the briefing procedures established in this case, these motions ("Phase I briefs") only address "common issues" of Federal RICO and preemption.  (*See* Plaintiffs' Report the Court Regarding Proposed Briefing Schedule for Motion to Dismiss, DE 122; Order Setting Briefing Schedule, DE 127).  The parties have agreed that during Phase I, the Defendants would submit one joint motion on the common issues.  (*Id.*).

Having reviewed the motions and related pleadings, the relevant case law and statutes, and having considered the parties' arguments, I have determined that the Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), codified at 18 U.S.C. § 1964(c), bars the federal RICO claims asserted by Plaintiffs, and I decline to exercise supplemental jurisdiction over the remaining state law claims.  I therefore dismiss with prejudice the federal RICO claims (Counts I-IV) because they are legally barred, except as to Defendant Labella, and dismiss without prejudice and remand to state court the remaining state law claims (Counts V-XV).[3]

---

until the case reached the Phase II briefing stage.  Accordingly, Plaintiffs did not respond to Black's motion.  While I have not considered Black's argument as to personal jurisdiction, as explained further below, the Complaint is dismissed as to Black based on the Private Securities Litigation Reform Act ("PSLRA").

[3]

This a large multiparty case and Plaintiffs have been unable to serve the following Defendants: (1) Vincent Langella; (2) L. Vincent Roth III; (3) Richard J. Schecher; (4) Dorian Mathews; and, (5) GM Financial.  I have granted Plaintiffs a second enlargement of time within which to serve these defendants [DE 148].  As a result,  Plaintiffs have up to and including July 29, 2008 to effectuate service.  As will be further explained in this Order, however, because these defendants are similarly situated to the moving defendants, the Federal RICO claims are dismissed as to these parties as well.

I.      Background

The relevant facts,[4] as alleged in Plaintiffs' First Amended Complaint [DE 84], taken

as true in deciding a motion to dismiss, are as follows:

A.      Nature of the Case

This case is brought because, according to Plaintiffs, members of organized crime,

brokerage firms, securities clearing firms, banking institutions, and their various individual

members, officers and employees, participated in massive racketeering schemes that

manipulated Eagletech stock to create enormous illegal profits for the conspirators while,

at the same time, destroying Eagletech.[5]  (Am. Compl., ¶ 1).  Numerous federal criminal

and civil cases stemming from an undercover FBI investigation, "Operation Uptick," into

Mob-controlled securities operations revealed that Eagletech was one of dozens of

companies victimized by the alleged far-reaching, inter-related racketeering conspiracies

between several Wall Street institutions and the members and associates of all five New

York Mob families.  (*Id.* at ¶ 2).  According to Plaintiffs, the Mob used the U.S. Securities

markets to produce illicit profits for the purpose of "obtaining easily ill fattens monies by any

---

[4]

The facts of this case spread over 61 pages encompassing 181 paragraphs.  This section
merely summarizes the nature of the case and the allegations relevant to the motions to
dismiss.

[5]

In 2001, Eagletech commenced litigation in Florida state court against parties that were
allegedly primarily responsible for the manipulation of Eagletech stock in a case styled
*Eagletech Communications, Inc. v. Bryn Mawr Investment Group, et al.,* 17th Judicial Circuit
in and for Broward County, Florida, Case No. 03-012404-02.  The instant action alleges
that various individuals named as defendants in the prior action but not named as
defendants in this action (described by Plaintiffs as "Non-Party Defendants"), including
members of organized crime, purportedly manipulated the price of Eagletech stock, and
that the Moving Financial Institutions and others named as Defendants in this action
allegedly aided and abetted in such manipulation.

means necessary to support the Mob's members and associates lavish life styles and, most importantly, support the continued operations of organized crime." (*Id.*).  Operation Uptick resulted in criminal charges against 120 individuals named in 21 separate charging documents.   (*Id.* at ¶ 7).  The defendants in the criminal charges included members and associates of all five New York Mob families, and allegations that they controlled or infiltrated several brokerage firms.   (*Id.*).  The allegations in the criminal charges included "fraudulent Internet touting of stocks, fraudulent private placements, pump and dump schemes, prearranged trades, bribes, 'no net sales' policies, and brokers bring subjected to 'beating, intimidation, and threats'." (*Id.* at ¶ 7) (quoting testimony of Barry R. Goldsmith before the Finance and Hazardous Materials Subcommittee of the House Commerce Committee on Organized Crime in the Securities Market, September 13, 2000).   The criminal cases brought against these individuals involved the "blatant manipulation of several stocks; manipulation facilitated by a racketeering conspiracy that ... included ... firms controlled by organized crime that were used to manipulated the sale of Eagletech stock." (*Id.* at ¶ 8).

Defendants in this action include members of La Cosa Nostra,[6] as well as individuals, brokers, dealers, clearing firms, prime brokers, market makers and bankers who allegedly conspired with those criminals to unlawfully and knowingly manipulated the price of Eagletech stock in exchange for excessive fees, bribes, kickbacks, commissions,

---

[6]

The only named Defendant in this action that is allegedly a member of La Cosa Nostra is Defendant Black who, according to Plaintiffs, is an "associate of the Luchese Crime Family and Chief Operating Officer at Grady & Hatch Company, Inc., a New York broker-dealer..." (Compl., ¶ 36).  The remaining members of La Cosa Nostra which were involved in the alleged manipulation of Eagletech stock are non-parties to this suit.

gifts, loans, money, and things of value.  (*Id.* at ¶ 3).  Plaintiffs argue that Defendants'

actions constitute a pattern of predicate crimes prohibited by federal and state law,

including the transfer or transmittal in interstate commerce of money or property they knew

to have been stolen or converted, money laundering, and the illegal counterfeiting of

shares of Eagletech.  (*Id.*).  Plaintiffs seek to "recover the actual and punitive damages to

which they are entitled for the devastating manipulation of Eagletech stock that destroyed

the company..."  (*Id.* at ¶ 4).

The allegations in this action stem, in part, as a result of Plaintiffs being able to

obtain "internal records of some of the alleged conspirators and a key database from the

U.S. Securities and Exchange Commission ("SEC")."  (*Id.* at ¶ 10).  The documents were

obtained by the SEC in 2000 when it subpoenaed broker-dealers and clearing firms for

information regarding the trading in Eagletech stock.  (*Id.*).  The database contains the

name and addresses of the purchasers and sellers of Eagletech stock and details the

reported activity in Eagletech by broker-dealers and their prime brokers/clearing firms,

including the Defendants in this action.  (*Id.*).  When Plaintiffs attempted to match the

information from the SEC database to the data reported in the Equity Trade Journal from

the National Association of Securities Dealers Automated Quotations system ("NASDAQ"),

which gives trade-by-trade information as reported to the public marketplace, Eagletech

discovered that the information significantly differed between the two databases.  (*Id.* at

¶¶ 12-13).  Through the accumulation and analysis of several documents, Plaintiffs can

allegedly demonstrate the extend and impact of the racketeering conspiracies that "caused,

aided, and abetted the destructive manipulation of the stock of so many companies –

including Eagletech...".  (*Id.* at ¶ 15).

Eagletech first became a victim of organized crime when it became a publicly traded security company and sought to obtain funding through typical small public company funding agreements known as PIPEs – Private Investment in Public Equity.  (*Id.* at ¶ 73).  The lenders with whom Eagletech entered into the PIPEs utilized sham companies controlled by members of organized crime to manipulate Eagletech stock, and "Eagletech soon became one of several companies caught up in illegal manipulation of their publicly-traded stocks by a group of avowed criminals and their cohorts at presumably respectable financial institutions."  (*Id.* at ¶ 74).

Plaintiffs allege two Racketeering Enterprises in this action: the BMIG/VFS Enterprise, and the Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise.

B.     The BMIG/VFS Racketeering Enterprise[7]

The BMIG/VFS Enterprise obtained 10 million shares of common stock in exchange for $1.2 million.  (*Id.* at ¶ 77).  These shares were transferred into a Bahamian shell company accounts at various brokerage firms, and constituted approximately 92% of the outstanding non-restricted Eagletech shares.  (*Id.*).  The enterprise participants advised Eagletech's founder, Rod Young, to conduct an offering of the securities pursuant to Rule

---

[7]

The BMIG/VFS Enterprise is comprised of Bryn Mawr Investment Group; Valley Forge Securities, Inc.; Robert Montani; James Cavaliere,; Alexander Ricci; Vincent Langella; Michael T. Garbo; Tonino Labella; John Black; Vincent Anthony Zeccola; and, L. Vincent Roth.  Some of these participants have not been named as defendants in this suit.  In addition, Defendants Zeccola, Black, Knight, BNY, Madison Bank, Citigroup, Tower Equities, Herzog, MFG, and Goldman Sachs,  all of which have moved for dismissal, allegedly participated in the enterprise.  (*See* Am. Compl., ¶¶ 157, 158).

54 of Regulation D of the Securities Act 1933 to avoid the need to register the officer with the SEC.   (*Id.* at ¶ 78).  The BMIG/VFS Enterprise participants had, in actuality, already solicited private investors to purportedly purchase the shares in private offerings, and had raised almost $1.6 million from those investors.  (*Id.*).  The racketeers further told those private investors that each had purchased a specific number of shares, and caused letters and brokerage statements to be sent allegedly confirming the purchase of Eagletech shares at prices ranging from $1.00 to $2.50 per share. (*Id.* at ¶ 79).  No shares or Eagletech stock were actually issued or owned by the selected investors.   (*Id.* at ¶ 80).

Instead, the BMIG/VFS Enterprise pocketed the money from the private placement investors.  (*Id.*).  In addition, the racketeers re-sold the same stock to purchasers in the public market at prices higher than those reportedly paid by the private investors.  (*Id.* at ¶ 81).  Plaintiffs allege that conspirators were able to accomplish this scheme by offering excessive, undisclosed commissions and bribes to brokers in exchange for promoting and selling their Eagletech stock. (*Id.*).  The BMIG/VFS Enterprise also orchestrated a Ponzi scheme type return for investors by lying to private investors and telling them that they had sold their Eagletech stock at about $4.00; letters with the false information were sent to these investors.  (*Id.* at ¶ 82).  In reality, the BMIG/VFS Enterprise had sold the stock at amounts well above those reported, and used the exceed proceeds to pay kickbacks to brokers for their involvement.  (*Id.* at ¶ 83).

When Eagletech needed a second round of financing, it was introduced to non-party John Dorocki, a Vice President and Senior Planner in the Salomon Smith Barney ("SSB") Executive Financial Services department, and to a group of Chicago investors headed by

non-party Randall Goulding.  (*Id.* at ¶ 87).  This group dealt directly with organized crime members regarding the financing knowing that they were connected to organized crime. (*Id.* at ¶ 88). The group planned to takeover Eagletech.  (*Id.* at ¶ 89).  In order to maximize their profits, the group acted in concert to manipulate the value of Eagletech stock.  (*Id.* at ¶¶ 90-91).  The group coordinated, among other things, short selling of Eagletech stock in a manner to avoid detection.  (*Id.* at ¶ 93).  John Serubo, a non-party defendant involved in the alleged manipulation, has previously testified that stock manipulation occurs in several ways, including when one conspires with others to hold the price of stock up or down; or, when one pays off market makers; uses influence on market makers to long or short the stock; uses a market marker to give orders to other market makers to make one side look stronger than the other; etc.  (*Id.* at ¶ 94).  While their stock manipulation scheme was taking place, the racketeers were lying to Eagletech.  (*Id.* at ¶ 96).  The plan to take over Eagletech, however, hit a major roadblock because the group did not actually hold any shares of Eagletech stock.  (*Id.* at ¶ 97).

Among other acts of manipulation, some conspirators sold the stock "short" without owning the shares they were selling or without having the ability to borrow those shares in the market; this is known as "naked shorting" of stock.  (*Id.*).  In an attempt to obtain more shares, Goulding appointed himself as special counsel to Eagletech without authority to do so, and began to send "conversion notices" and other unauthorized correspondence to Eagletech's attorneys to have shares of the company's stock issued to the group.  (*Id.* at ¶ 98).  When Eagletech discovered Goulding's attempt to convert without first receiving the appropriate authorization, it instructed its transfer agent to cancel any such certificates that

were issued pursuant to Goulding's instructions.  (*Id.*).  The unsuccessful attempt to take over Eagletech nonetheless destroyed its share value and put the company into a predicted "death spiral" through the use of "illegal trading techniques; techniques that were available to the conspirators only because of the actions of the ... Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise."  (*Id.* at ¶ 100).

     C.     The Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise[8]

Plaintiffs allege that the BMIG/VFS Enterprise and the SSB/Goulding conspirators were able to avoid regulatory requirements in their manipulation of stocks because some of the largest financial corporation engaged in a racketeering conspiracy that allowed the "illegal sale and manipulation of stocks – including Eagletech – for their own financial gain." (*Id.* at ¶ 102).  Market manipulation, such as naked short sales, can corrupt the market in order to generate a "riskless profit", and exponentially increase the supply of shares of a given stock offered for sale allowing stock manipulators to engineer the price of the stock all the way down to nothing (i.e. a "death spiral").  (*Id.* at ¶ 109).  According to Plaintiffs, the entity defendants, by controlling the records that would show stock manipulation and not acting on that information, "effectively assisted and facilitated the manipulation of Eagletech stock, including but not limited to the creation of counterfeit or phantom Eagletech securities, pegging prices and matching and washing trades."  (*Id.* at ¶ 110).

---

[8]

This enterprise consists of the following defendants: Bear Stearns; J. Alexander Securities; J.E. Liss & Co.; MFG; Merril Lynch; Pierce, Fenner & Smith, Inc.; NF Clearing, Inc. d/b/a Fiserv Securities, Inc. ("Fiserv"); Oscar Gruss; Prudential; and, Tucker Anthony, several of which are part of the Moving Financial Institutions.

According to Plaintiffs, a legitimate short sale involves a seller who first either borrows the stock to be sold or has a documented arrangement to borrow it so that the stock can be delivered to the buyer by the required sale settlement date, which is usually three days. (*Id.* at ¶ 107).  In a naked short sale, the seller does not actually own and has not made a provision to borrow the stock.  (*Id.* at ¶ 108).

Plaintiffs allege that these defendants had a duty within their self-regulating industry to protect investors and issuers of stock from fraud and to protect the integrity of the self-regulated market place but, by failing to comply with industry standards and regulations, these defendants aided, abetted and facilitated the manipulation of Eagletech stock.  (*Id.*). Plaintiffs further allege that these failures to deliver by the settlement date were not inadvertent; rather, these defendants' failure to perform the functions required by federal law and regulation were part of an overall strategy for them to profit from such stock manipulation.  (*Id.* at ¶ 111).  Plaintiffs allege that these defendants knew or with little effort should have known that their customers that were manipulating the stock were organized crime; and that this enterprise continued to solicit business of organized crime even after the announcement of Operation Uptick.  (*Id.* at ¶ 14).

In addition, Plaintiffs allege that these defendants had the duty to detect suspicious transactions and to inquire into possible money laundering but that, in this instance, they failed to do so even after Operation Uptick and knowing that they were dealing with organized crime.   (*Id.* at ¶ 114).  Examples of suspicious activity these defendants failed to investigate include: (1) from August 1999 through December 2000, there are 4,093 trades without a contra party – meaning that the defendants were trading with no one –

for 6,571,815 shares; and, (2) 4,117,400 shares remain to be accounted in "long" sells traded with at least 81 different firms. (*Id.* at ¶ 115). Plaintiffs state that the SEC had this data, which supports the Plaintiffs' Amended Complaint, "but chose not to prosecute the facilitators of illegal transactions and the money launders that allowed organized crime to conceal their profits from their illegally obtained proceeds." (*Id.*). In essence, Plaintiffs allege that these defendants facilitated the manipulation, trading and clearing of Eagletech stock. (*Id.* at ¶ 116).

Allegations involving the Moving Financial Institutions include the following:

1.   After the announcement of Operation Uptick, the Bank of N.Y., among others, continued to conduct business as usual with the mob "[b]ecause of the cozy relationship between the BMIG/VFS racketeers and their clearing firm accomplices, who were paid handsomely to manipulate stock." (*Id.* at ¶ 118).

2.   MFG accounted for several cross trades "designed to indicate a false appearance of interest and liquidity in the marketplace for the Eagletech securities and was in a position to see these washed or matched trades occurring...". (*Id.* at ¶ 123).

3.   Knight purchased shares and distributed them to various broker-dealers selling to the investing public; the sales were cleared trades through Merrill Lynch. (*Id.* at ¶¶ 128-129). The transactions resulted in Knight receiving many thousands of dollars from trades that were engineered at an artificial price posted to the marketplace. (*Id.* at ¶ 129). The prices were prearranged, thus causing illegal distortions in the market's ability to determine the true and accurate price of the stock. (*Id.* at ¶ 130). "Knight's market making actions belie a regular, orderly, and transparent market." (*Id.* at ¶ 131).

5.   Merrily Lynch was responsible for Knight's blue sheet reporting to the SEC and was therefore in a position to know that stock was going through Knight and its subsidiaries at prices substantially different than those reported in the marketplace or sold short into the marketplace. (*Id.* at ¶ 132). Merrill Lynch had a responsibility to monitor Knight, its largest trading customer, for improper trading and report suspicious activity to regulators. (*Id.* at ¶ 136).

6.   Knight distribute over 1.2 million shares of Eagletech into the public markets that were cleared through Merrill Lynch; 629,900 of which were distributed into the public market after the announcement of Operation Uptick.  (*Id.* at ¶ 134).

7.   Prudential acted as a market maker for the sort sales, but none of the short sales through Prudential were marked as short sales.  (*Id.* at ¶ 138).  Prudential also maintained its failure-to-deliver positions for more than four months, reaching a hight of 578,000 shares.  (*Id.*).

8.   Other clearinghouses had a handful of briefer and smaller delivery failures:  Bear Stearns had 29 trading days at an average of 6,027 shares per day; Oscar Gruss had 21 trading days at an average of 10,302 shares per day; and, Tucker Anthony sold 240,900 shares while only purchasing 74,600 shares.  (*Id.* at ¶ 140).

The Amended Complaint finally alleges that various defendants, including Citigroup and Madison Bank, were responsible parents of and/or acted to launder the ill-gotten gains from the above mentioned criminal conspiracies.  (*Id.* at ¶ 141).  Additionally, the Bank of Nova Scotia of New York and its subsidiary group were used to move profits from the enterprises' illicit stock manipulation scheme and held accounts for the money obtained from the operation.  (*Id.* at ¶ 148).

D.   Allegations Related to the Federal Claims

1.   The BMIG/VFS Enterprise

Plaintiffs allege that members of the BMIG/VFS Enterprise, including Non-Party Defendants, participated in illegal activities by engineering trades of Eagletech stock at manipulated prices and/or laundering and transporting the illegal profits and monies generated by the racketeering activities.  (*Id.* at ¶ 156).  According to Plaintiffs, the participants had knowledge of and a stake in the illegal activities, and independently profited from those activities in the form of illegal commissions, gifts, bribes, or kickbacks. Further, Defendants Knight; Lewco Securities Corporation; Schroder & Co., Inc.; Grady &

12

Hatch; MFG, Herzog; Fiserv; Tower Equities; GM Financial; Goldman Sachs; and, Schecher and Mathews participated in the enterprise by facilitating trades of Eagletech stock at manipulated prices and/or laundering and transporting the illegal profits, with knowledge and a stake in the illegal activities.   (*Id.* at ¶ 157).   Similarly, BNY and its subsidiary Scotia Bank; Madison Bank; and, Citigroup knowingly or recklessly laundered funds and transferred money and property in interstate and foreign commerce that was the product of illegal activities.  (*Id.* at ¶ 158).

Plaintiffs allege that the BMIG/VFS Enterprise carried out the following predicate crimes: (1) transportation in interstate or foreign stolen commerce; (2) money laundering; and, (3) engaging in monetary transactions in property derived from unlawful activity (i.e. stock manipulation).  (*Id.* at ¶¶ 160-165).  These predicate crimes "are related in that they are connected to one another as part of a scheme to accomplish an unlawful purpose: to manipulate, destroy, and/or (as in the case of Eagletech) take over the ownership of emerging companies through unlawful means."  (*Id.* at ¶ 168).  According to Plaintiffs, "the threat of future occurrence is established by the ongoing and continuing nature of the purpose of the Predicate Crimes (i.e., to exploit emerging companies through PIPE financing and illegal naked shorting/failures to deliver securities, matching and washing trades, pegging prices and other forms of stock manipulation)..."  (*Id.* at ¶ 169).

       2.   <u>The Clearing Firms, Prime Brokers, and Financial Institutions Racketeering Enterprise</u>

Plaintiffs allege that this enterprise carried out the following predicate crimes: (1) transportation in interstate or foreign stolen commerce; (2) money laundering; and, (3) engaging in monetary transactions in property derived from unlawful activity (i.e. stock

manipulation).   (*Id.* at ¶¶ 173-182).   Specifically, Plaintiffs allege that participants committed these crimes when they "intentionally executed transactions that they accounted for that facilitated the stock manipulation of Eagletech including but not limited to not requiring the proper delivery of short sold stock, thus allowing these 'fail to deliver' positions to remain 'open' for long periods of time, for their own benefit as well as part and parcel of an understanding between themselves to conspire in not requiring proper delivery and closing of trades, washing and matching, and pegging prices."  (*Id.* at ¶¶ 174,177, 181).

Further, these defendants "executed or cleared trades involving the manipulation of Eagletech shares [sic] i.e. trades for which there were no shares actually delivered and as to which they required no shares to be delivered, washed and matched trades or pegged prices trades...".  (*Id.* at ¶ 173).  These predicate crimes "are related in that they are connected to one another as part of a scheme to accomplish an unlawful purpose: to manipulate the price of stock by means including, but not limited to, short selling stock without mandating or enforcing the delivery of such stock as required by federal law and regulation, washing and matching trades and pegging prices."  (*Id.* at ¶ 184).  Further, the enterprise participants were aware that the manipulation of stock strategies employed are illegal and have been used to destroy, and/or take ownership of emerging companies through unlawful means.  (*Id.*).  According to Plaintiffs, continuity is established by the numerous different companies involved and the empirical evidence demonstrating that their actions are not random or independent, but are rather part "of an understanding between the clearing firms and prime brokers to cooperate in stock manipulation...".  (*Id.* at ¶ 185).  Finally, the threat of future occurrence is shown by the ongoing nature of the

purpose of the understanding to cooperate, as well as the numerous different companies who have continual presence on the New York Stock Exchange and NASDAQ Reg. SHO Threshold Lists that detail the continuing nature of the failure to delivery stocks.  (*Id.* at ¶187).

E.   The Amended Complaint

Based on these allegations, Plaintiffs filed an Amended Complaint[9] setting forth fifteen (15) counts against the various defendants.  Plaintiffs have invoked the Court's federal question jurisdiction, pursuant to 28 U.S.C. § 1331, in brining four counts for alleged violations of the U.S. Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d).  Plaintiffs have also invoked the Court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, for the remaining state law claims, which include claims for violation of Florida's Civil Remedies for Criminal Practices Act, Fla. Stat. §772.103, civil conspiracy, negligence *per se*, negligence, conversion and trespass to chattels.

Counts I and II are plead against the BMIG/VFS Racketeering Enterprise Defendants, including some of the moving defendants, and allege a violation of RICO, 18 U.S.C. § 1962(c), and a Conspiracy in violation of 18 U.S.C. § 1962(d).  Counts III and IV are plead against the Clearing Firms, Prime Brokers and Financial Institutions, including several of the moving defendants, and allege a violation of RICO, 18 U.S.C. § 1962(c), and

---

[9]

The initial Complaint was filed in the Seventeenth Judicial Circuit, in and for Broward County, Florida.  Defendants removed the case to this Court pursuant to 28 U.S.C. § 1441 based on federal question jurisdiction [DE 1].

a Conspiracy in violation of 18 U.S.C. § 1962(d).[10]

II.    Standard of Review

In determining whether to grant a motion to dismiss, the court must accept all the factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff.  *Hoffend v. Villa*, 261 F.3d 1148, 1150 (11th Cir. 2001).

Although a plaintiff need not state in detail the facts upon which he bases his claim, Fed. R. Civ. P. 8(a)(2) "still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 n.3 (2007).  In other words, a plaintiff's pleading obligation requires "more than labels and conclusions." *Id.* at 1964-65; *see also Pafumi v. Davidson*, No. 05-61679-CIV, 2007 WL 1729969, at *2

---

[10]

As noted above, the Moving Financial Institutions, Black, Zeccola, and Tower Equities include alleged participants in each of the two alleged enterprises.  During oral argument, I inquired whether the pending motions to dismiss apply to all Defendants, including those defendants who did not file Phase I briefs and those who have not yet being served, or whether the decision would apply only to those defendants who have personally moved for dismissal.  The moving defendants responded that dismissal of the counts should apply across the board since alleged  members of both enterprises have moved for dismissal, and finding that the PSLRA bars the RICO claim as a matter of law is a ruling that affects all defendants that are similarly situated.  Although given an opportunity to argue otherwise, Plaintiffs did not oppose the Defendants' position.  I further note that the record in this case indicates that the parties agreed to file a joint Phase I brief discussing common issues as to the Federal RICO claims and Federal Preemption.  For these reasons, and noting that Plaintiffs have had ample opportunity to respond to the argument that the PSLRA bars the four RICO claims in their entirety, I conclude that dismissal of these counts applies to all defendants similarly situated, including those that have not personally moved for dismissal or who have not been properly served.  Based on the allegations of the Amended Complaint, the only defendant that is not similarly situated to the moving defendants is Tonino Labella, as he is the only named defendant that has allegedly been indicted and plead guilty to federal charges brought against him based on his role in the manipulation of Eagletech stock.  (Am. Compl., ¶ 37).

(S.D. Fla. June 14, 2007).  The previous standard that there be "no set of facts" before a motion to dismiss is granted has thus been abrogated in favor of the requirement that a pleading must be "plausible on its face."  *Bell Atl.*, 127 S. Ct. at 1968, 1974 (discussing *Conley v. Gibson*, 355 U.S. 41 (1957)); *see also*, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007) ("While Rule 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable, the factual allegations must be enough to raise a right to relief above the speculative level.") (citing *Bell Atl.*, 127 S. Ct. at 1965) (internal quotations omitted)).  In order to survive a motion to dismiss, the Plaintiff must have "nudged [its] claims across the line from conceivable to plausible."  *Bell Atl.*, 127 S. Ct. at 1974.

III.    Analysis

Defendants allege that the federal claims must be dismissed for two reasons.  First, the RICO claims are expressly precluded by the PSLRA, which amended the federal RICO statute to eliminate securities fraud as a predicate act in federal RICO actions.  According to Defendants, courts have interpreted the amendment broadly and have consistently rejected efforts to evade the amendment by pleading predicate acts that, although not labeled securities fraud, are nonetheless actionable as such.  In this case, the Moving Financial Institutions argue that Plaintiffs' case against them turns on a theory that they somehow facilitated manipulative securities trading.[11]  Second, Defendants argue that the RICO claims are precluded by longstanding principles of federal preemption, as more

---

[11]

Likewise, the entire case against the BMIG/VFS Enterprise defendants turns on a theory of stock manipulation and facilitation of stock manipulation for personal gain.

recently enunciated in *Credit Suisse Sec. (USA) v. Billing,* 127 S. Ct. 2382, 2395-96 (2007).  Because I conclude that the PSLRA precludes Plaintiffs' federal RICO claims as to all Defendants, I dismiss with prejudice counts I-IV of the Amended Complaint, and do not reach the question of whether *Billing* preempts those claims.[12]  In Section III.C of this Order, I discuss my decision to decline to exercise supplemental jurisdiction over the remaining state law claims, and therefore dismiss the remaining state law claims (Counts V-XV) without prejudice.  Having so decided, I do not entertain the Defendants' argument that the state law claims are preempted by federal law because Plaintiffs' proposed application of state law would conflict with the federal securities laws.  Instead, I remand the remaining claims for the state court judge to consider them.

A.     The Federal RICO Act

The RICO Act, 18 U.S.C. § 1961, *et seq.,* provides civil and criminal liability for persons engaged in a "pattern of racketeering activity."  *See* 18 U.S.C. §§ 1962(a-d).  To state a civil claim under the act, a person injured by its violation must allege the following four elements: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity.  *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311 (11th Cir. 2000).  Plaintiffs

---

[12]

Although the PSLRA bar does not preclude the RICO claims against Labella, I do not consider the *Billing* preemption argument because I find it inapplicable.  In their Motion to Dismiss, the Moving Financial Institutions argue that Plaintiffs' claims that the Moving Financial Institutions facilitated the manipulation of Eagletech stock by allowing short sales and "fails to deliver" are inconsistent with the SEC's regulatory scheme and are thus precluded under the reasoning of *Billing.*  The allegations against Labella, however, include more than his alleged role in these short sales.  Thus, even if I agreed with the Moving Financial Institutions' argument, the claims against Labella will survive, at least in part.  Labella will have an opportunity to raise a *Billing* argument as it applies to the allegations made against him in Phase II briefs, if appropriate, to which Plaintiffs will have an opportunity to respond.

in civil RICO actions must identify and prove a pattern of racketeering activity, defined as two 'predicate acts' of racketeering activity within a 10 year period.  *Id.* at 1311-1312 (citing 18 U.S.C. § 1961(5)).  "Racketeering activity" includes any act which is indictable under a lengthy list of criminal offenses, including the federal statutes prohibiting mail and wire fraud.  *Id.*  As stated above, Plaintiffs in this case allege the following predicate acts: (1) transportation of stolen money or property in violation of 18 U.S.C. § 2314; (2) money laundering in violation of 18 U.S.C. § 1956; and, (3) monetary transactions involving criminally derived property in violation of 18 U.S.C. § 1957.

  B. Private Securities Litigation Reform Act

   In 1995, Congress amended the federal RICO statute by enacting the PSLRA, § 107, Pub. L. No. 104-67, 109 Stat. 737 (1995), which narrows the type of conduct that can qualify as a predicate act under RICO.  *See* 18 U.S.C. § 1964(c).  Specifically, relevant parts of the RICO statute now provide that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962," unless the person who committed such conduct has been criminally convicted.  *Id.*  The Conference Committee Report accompanying the PSLRA states that the amendment was intended not only "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent a plaintiff from "pleading other specified offenses ... as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud."  H.R. Conf. Rep. No. 104-396 at 47 (1995); *see also Fla. Evergreen Foliage v. E.I. DuPont De Nemours and Co.,* 165 F. Supp. 2d 1345, 1356 (S.D. Fla. 2001) (same).

   To prevent circumvention of congressional intent, courts have interpreted the

PSLRA amendment broadly.  *See, e.g., Bald Eagle Area School Dist. v. Keystone Fin., Inc.* 189 F.3d 321, 330 (3d Cir. 1999) (stating that allowing a plaintiff to avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses where the conduct giving rise to those predicate offenses amounts to securities fraud would undermine the congressional intent behind the RICO Amendment.); *Swartz v. KPMG, LLC,* 401 F. Supp. 2d 1146, 1151 (W.D. Wash. 2004) ("The rule that a plaintiff cannot assert a RICO claim based on predicate acts that sound in securities fraud is applicable even if, as is the case here, the claim is plead as a matter of mail fraud or wire fraud.") (citing *Howard v. Am. Online Inc.*, 208 F.3d 741, 749-50 (9th Cir.2000), cert. denied, 531 U.S. 828 (2000)).  In determining whether the PSLRA bars a civil RICO claim, courts view the complaint in its entirety and reject the invitation to parse the plaintiff's allegations.  *See*, *e.g., Bald Eagle,* 189 F.3d at 329 (holding that the PSLRA bars an action where some, but not all, of the predicate acts are actionable as securities fraud, because allowing a "surgical presentation of the cause of action ... undermine[s] the congressional intent behind the RICO Amendment."); *Baron v. Chehab,* No. 05-3240, 2006 WL 156828, *8 (C.D. Ill. Jan. 20, 2006) (refusing to parse out plaintiff's claim to identify parts that might be separable from the securities fraud because Congress sought to eliminate RICO claims in securities fraud cases, and the careful parsing of the Amended Complaint would frustrate that Congressional goal); *Gatz v. Ponsoldt,* 297 F. Supp. 2d 719, 731 (D. Del. 2003) ("A plaintiff cannot circumvent the PSLRA's exclusion of securities fraud as a RICO predicate act through artful pleading.").  Thus, where the allegations in a complaint, taken as a whole, amount to conduct that can be actionable as fraud *in connection with* the

purchase or sale of securities, federal courts have uniformly applied the PSLRA's bar.  *See id.*

Defendants argue that, regardless of the labels Plaintiffs assign to their predicate acts, the PSLRA bars the civil RICO claims because they are based upon allegations of fraud in connection with the purchase or sale of securities.  *Cf. Champion,* 2008 WL 900967, at *13 (dismissing the RICO claims alleging wire and mail fraud and money laundering because the predicate acts were based on, and intrinsically connected to, conduct that would have been actionable as securities fraud).  Plaintiffs respond that the predicate acts sound in theft, not fraud, and are therefore not within the exception to the RICO statute, which only excepts conduct actionable as securities fraud.  Moreover, Plaintiffs contend that the conduct alleged against the Moving Financial Institutions is not "actionable" as fraud in connection with the sale or purchase of securities, because Section 10(b) of the 1934 Act does not allow an injured party to bring a claim for aiding and abetting securities fraud.  Plaintiffs further argue that the clear language of § 1964(c) supports its position that because no "person" can sue these defendants, the Plaintiffs are entitled to invoke their remedy under RICO.  In essence, their arguments are twofold: (1) the alleged conduct does not amount to securities fraud because it sounds in theft; and, (2) because at least some of these Defendants cannot be held liable as primary violators of the securities laws, the PSLRA bar does not apply and Plaintiffs' RICO civil claims should not be dismissed; or, in other words, because no "person" can sue these Defendants for aiding and abetting a securities fraud, the conduct is not "actionable" for purposes of the PSLRA bar.

    1.    <u>Whether the Conduct Alleged by Plaintiffs Amounts to Securities Fraud</u>

The alleged predicate acts involve the manipulation of Eagletech stock.  Even a cursory reading of the allegations reveals that the entire Amended Complaint stems from alleged manipulation of Eagletech stock, "including but not limited to not requiring the proper delivery of short sold stock, thus allowing these 'fail to deliver' positions to remain 'open' for long periods of time, for their own benefit as well as part and parcel of an understanding between themselves to conspire in not requiring proper delivery and closing of trades, washing and matching, and pegging prices." (Am. Compl., ¶¶ 174,177, 181). The very opening paragraphs of the Amended Complaint reveal that the lawsuit was brought to recover damages for the alleged "devastating manipulation of Eagletech stock that destroyed the company." (*Id.* at ¶ 4).  In fact, the very first paragraph explains that this case was brought because members of organized crime, brokerage firms, securities clearing firms, banking institutions, and their various individual members, officers and employees, participated in massive racketeering schemes that manipulated Eagletech stock to create enormous illegal profits for the conspirators while, at the same time, destroying Eagletech.  (Am. Compl., ¶ 1).  Thus, the essence of the misconduct alleged in the Amended Complaint can be summarized as follows: the BMIG/VFS Enterprise manipulated Eagletech stock, and the Clearing Firms, Prime Brokers and Financial Institutions Racketeering Enterprise aided and abetted such manipulation, for personal gain.

While Plaintiffs try to disguise the predicate acts as sounding in theft, not fraud, the Amended Complaint is replete with allegations of stock manipulation. (*Id.* at ¶¶ 1, 3, 4, 8, 9, 15, 20, 29, 30, 32-44, 74, 76-84, 90-92, 94, 97, 101, 102, 108, 110, 111, 114, 116-119,

156, 157, 168, 169, 173, 177, 181, 184-185).  Plaintiffs, to no avail, attempt to circumvent

the PSLRA bar by labeling the predicate acts as (1) transportation in interstate or foreign

stolen commerce; (2) money laundering; and, (3) engaging in monetary transactions in

property derived from unlawful activity.  *See Burton v. KenCrest Servs.,* 127 F. Supp. 2d

673, 676-677 (E.D. Pa. 2001) (rejecting the plaintiff's attempt to recast the alleged acts as

"theft," because there was "no question that the whole of Plaintiff's allegations concern a

fraudulent transaction of securities," and "Plaintiff cannot magically revive his claim by

picking discreet [sic.] details of his allegations" to claim they are not actionable as

securities fraud).  But Plaintiffs themselves admit that these predicate acts, as alleged

against the BMIG/VFS Enterprise, "are related in that they are connected to one another

as part of a scheme to accomplish an unlawful purpose: to manipulate, destroy, and/or (as

in the case of Eagletech) take over the ownership of emerging companies through unlawful

means."  (Am. Compl. at ¶ 168).  Similarly, according to Plaintiffs, these predicate acts,

as alleged against the Clearing Firms, Prime Brokers and Financial Institutions Enterprise,

"are related in that they are connected to one another as part of a scheme to accomplish

an unlawful purpose: to manipulate the price of stock by means including, but not limited

to, short selling stock without mandating or enforcing the delivery of such stock as required

by federal law and regulation, washing and matching trades and pegging prices."  (*Id.* at

¶ 184).  Plaintiffs further allege that the very purpose of both enterprises was to manipulate

Eagletech's stock for the benefit of the enterprise participants.  (*Id.* at ¶¶ 101, 102, 156,

157).

Moreover, Plaintiffs allege that "the threat of future occurrence is established by the

ongoing and continuing nature of the purpose of the Predicate Crimes (i.e., *to exploit*

23

*emerging companies through PIPE financing and illegal naked shorting/failures to deliver securities, matching and washing trades, pegging prices and other forms of stock manipulation)...*".  (*Id.* at ¶ 169) (emphasis added).  Plaintiffs also allege that the cause of their RICO injury was caused by the manipulation of Eagletech securities.  (RICO Statement, ¶¶ 25-27).

The law is clear that stock manipulation is a form of securities fraud governed by federal securities laws. *See generally Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 79 (U.S. 2006); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (U.S. 1977) ("Manipulation is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.") (internal quotations and citations omitted).  Consequently, the alleged misconduct of the BMIG/VFS Enterprise, i.e. the manipulation of Eagletech stock, is a form of securities fraud. Similarly, the alleged misconduct of the Clearing Firms, Prime Brokers and Financial Institutions Enterprise, i.e. the facilitation of stock manipulation, is also a form as securities fraud pursuant to 15 U.S.C. § 78t, which was enacted by Congress to authorize the SEC to bring actions against defendants who aid and abet securities fraud. 15 U.S.C. § 78t (titled "Liability of controlling persons and persons who aid and abet violations")[13].

In addition, as Plaintiffs admit, the facts that underlie the SEC's complaint filed

---

[13]

Plaintiffs reliance on *Central Bank, N.A. v. First Interstate Bank, N.A.,* 511 U.S. 164 (1994) for their argument that Section 10(b) does not include a claim for aiding and abetting is misguided, since the decision was superseded by the enactment of 15 U.S.C. § 78t. Thus, Plaintiffs' argument that the conduct challenged is not a form of securities fraud unless Defendants can be held liable as primary violators is meritless.

against many of the same individuals named as Defendants in this case are the same facts that underlie Plaintiffs' RICO claims.  (*Id.* at ¶¶ 8, 9, 10, 84).  According to Plaintiffs, this action stems from their ability to obtain "internal records of some of the alleged conspirators and a key database from the [SEC]." (*Id.* at ¶ 10).  When facts underlying an SEC action are the same as the facts underlying a federal RICO action, the PSLRA bar applies.  *See Bald Eagle*, 189 F.3d at 32-329.  I therefore conclude that the entire case is about an alleged scheme to manipulate securities, and that Plaintiffs' RICO allegations are based on fraud in connection with the purchase and sale of securities.

       2.   <u>Whether the Conduct Alleged is "Actionable" for Purposes of the PSLRA</u>

       Plaintiffs second argument is that the PSLRA bar does not apply because these Plaintiffs do not have standing to bring a securities fraud claim against these Defendants, since aiding and abetting is not actionable by a private plaintiff under Section 10(b) of the Securities Act of 1934 ("Section 10(b)").  In *Florida Evergreen Foliage*, I rejected the argument that the PSLRA only operates as a bar to civil RICO claims if the claims could be actionable by the same plaintiff.  *Fla. Evergreen Foliage*, 165 F. Supp. 2d at 1357-1358. In the absence of Eleventh Circuit precedent, I relied on *Howard v. America Online Inc.*, 208 F.3d 741 (9th Cir. 2000), in which the Ninth Circuit Court of Appeals held that the PSLRA acted to bar their claim despite the fact that the named plaintiffs did not have standing to bring a securities fraud claim against AOL because the alleged conduct "could be brought by a plaintiff with proper standing."  *Howard*, 208 F.3d at 749; *Fla. Evergreen Foliage,* 165 F. Supp. 2d at 1357 ("Plaintiffs have done nothing to distinguish *Howard v. America Online Inc.*, 208 F.3d 741 (9th Cir. 2000), and the Court finds that case

persuasive."). My independent research has not revealed any Eleventh Circuit or any other Circuit Court of Appeals decisions on the standing issue since that time. However, other district courts that have considered Plaintiffs' argument have also rejected it. *See, e.g., Baron,* 2006 WL 156828, at *9, n. 2 ("[T]he bar to RICO claims is based on whether the conduct is actionable as securities fraud, not whether a particular plaintiff could bring the action."); *Cook v. Campbell*, 482 F. Supp. 2d 1341, 1350 (M.D. Ala. 2007) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws."); *Gatz*, 297 F. Supp. 2d at 731("PSLRA's exclusion of securities fraud as a RICO predicate act applies regardless of whether a particular plaintiff has standing to bring a civil action under § 10b and Rule 10b-5."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 620 (S.D. Tex. 2003) ("The RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws."); *In re Ikon Office Solutions Inc. Sec. Litig.*, 86 F. Supp. 2d 481, 486 (E.D. Pa. 2000) (decided prior to *Howard*). I continue to find the rulings in these district court cases persuasive.

During oral argument, Plaintiffs' counsel conceded that courts have rejected his standing argument. However, he urged the Court to rely on the text of the statute and to deviate from prior rulings. The text of § 1964(c), with the language added by the PSLRA highlighted, is as follows:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, **except that no**

**person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.**

18 U.S.C. § 1964(c).  Plaintiffs interpretation is that the statute prohibits "persons" who have a claim for securities fraud under Section 10(b) and Rule 10-b5 from brining a RICO claim based on conduct that would have been actionable as fraud in the purchase or sale of securities.   Reading the language "no person" found in the rule's exception in conjunction with "any person injured" found in the general rule means that the injured person is precluded from bringing a RICO claims only if he could also bring a securities fraud claim against the alleged violators.   Since the Government, in this case the SEC, is not a "person," and since private individuals are not authorized to bring civil causes of actions for aiding and abetting a securities fraud, no person can sue these Defendants on the facts as alleged.   For this reason, Plaintiffs argue that they are entitled to invoke their remedy under RICO.   Plaintiffs further note that the Government's civil remedies under RICO are located in a different subsection, and that the SEC's usual fraud remedies are located in a separate statute altogether.   Thus, the fact that the SEC could prosecute the alleged conduct as securities fraud under Title 15, does not place that action within Section 107 of the PSLRA amendment, which created an exception to the civil remedies of RICO in Title 18.

The problem with Plaintiffs' argument is that this is not an issue of first impression. I find no reason to deviate from prior precedent on this matter.  *See Fla. Evergreen Foliage,* 165 F. Supp. 2d at 1357 (rejecting argument that the act only operates to bar civil

RICO claims if the claims could be actionable by the same plaintiff).  Moreover, confronted with the very narrow issue of whether the PSLRA bars RICO claims predicated on facts that give the SEC authority to bring aiding and abetting claims under the federal securities laws, both the Central District of Illinois and the Southern District of Texas concluded that it did.  *See Baron,* 2006 WL 156828, *9 (holding because the SEC is authorized to bring aiding and abetting securities fraud actions, aiding and abetting securities fraud cannot form the basis of a RICO claim); *In re Enron Corp. Sec. Derivative & ERISA Litig.,* 284 F. Supp. 2d 511, 650 (S.D. Tex. 2003) (holding that the RICO claims were barred by the PSLRA because aiding and abetting securities fraud can be pursued by the SEC).  These decisions are consistent with the plain language of the statue, which does not condition its bar on whether the plaintiff has a securities fraud claim.  Instead, the statute merely provides that any "person" – i.e. the Plaintiffs – cannot rely on "any conduct that would be actionable as a fraud in the purchase or sale of securities" – i.e. stock manipulation and facilitating such manipulation.  I decline Plaintiffs' invitation to read into the statute the condition that the injured person, rather than the SEC, needs standing to bring the claim of securities fraud for the bar to apply.  *Cf. In re Enron Corp. Secs. Derivative & ERISA Litig.*, 284 F. Supp. 2d at 260 ("The language of the statute does not require that the same plaintiff who sues under RICO must be the one who can sue under the securities laws.").

In the Amended Complaint, Plaintiffs admit that the SEC could have prosecuted the Defendants under the securities laws, but chose not to.  (*See* Am. Compl., ¶ 115) ("The SEC has the documents and data that supports this Eagletech complaint but chose not to prosecute the facilitators of the illegal transactions and the money launders that allowed

organized crime to conceal their profits from their illegally obtained profits."). Therefore, by their own allegations, the predicate acts are actionable as securities fraud and may be prosecuted by the SEC. For this reason, the PSLRA acts as a bar to Plaintiffs' RICO claims. Having so concluded, Counts I-IV of the Amended Complaint are dismissed with prejudice as to all Defendants, with the exception of Defendant Labella.[14]

3.     Defendant Labella

Plaintiffs allege that Labella and non-party Serubo were "unwritten partners" in the stock business and invested in Eagletech through two companies Labella controlled. (Am. Compl., ¶ 75). Thereafter, Labella used at least 100 accounts at five or more brokerage houses to manipulate the price of Eagletech stock. (*Id.* at ¶ 76). In connection with Eagletech financing, Eagletech issued 10 million shares of common stock to Labella, Serubo and their nominees in exchange for $1.2 million. (*Id.* at ¶ 77). These individuals, in turn, transferred the shares into a Bahamian shell company. (*Id.*). Labella and Serubo then advised Young to conduct an offering of Eagletech securities pursuant to Rule 504 of Regulation D of the securities Act of 1933 to avoid the SEC register requirements. (*Id.* at ¶ 78). Labella and the BMIG/VFS crew had already raised $1.6 million from private investors interested in purchasing the Eagletech stock. (*Id.*). Labella and the BMIG/VFS racketeers caused letters and brokerage statements to be sent to the investors that

---

[14]

Because Plaintiffs can plead no set of facts to avoid the PSLRA bar as to these defendants, any further amendment to the complaint would be futile. Therefore, these claims are dismissed with prejudice and without leave to amend. *See Daewoo Motor Am. v. GMC*, 459 F.3d 1249, 1260-1261 (11th Cir. 2006) (finding that the bankruptcy court did not abuse its discretion where it dismissed a complaint with prejudice because any further amendment would be futile).

allegedly confirmed the purchase of Eagletech stock, but the shares were never actually purchased by these investors. (*Id.* at ¶¶ 79-80).  Instead, the stock was always held by Labella, Serubo and their nominees. (*Id.* at ¶ 80).  Labella also participated in the alleged Ponzi scheme type return the enterprise engaged in.   (*Id.* at ¶ 82).  The Plaintiffs also allege that Labella directed Defendant Montani to fill orders by selling Eagletech stock held at BMIG/VFS accounts that Labella controlled, and issued and used Axxess International ATM/credit cards to pay individual brokers bribes and kickbacks.   (*Id.* at ¶ 85).  In sum, the Amended Complaint alleges that Labella was primarily responsible for orchestrating and carrying out the manipulation of Eagletech stock.

At first glance, the RICO claims against Labella are precluded by the PSLRA as they include conduct actionable as securities fraud.  However, Defendant Labella is not similarly situated to the moving defendants, as he is the only individual who has allegedly been criminally convicted for his role in the manipulation of Eagletech stock.  (Am. Compl., ¶ 37) ("Labella was one of the primary architects of the scheme to manipulate the sale of Eagletech stock and has pled guilty to federal charges brought against him based on that activity.").  The PSLRA explicitly states that the exception to the RICO rule does not apply to persons who have been criminally convicted of fraud in the purchase or sale of securities. *See* 18 U.S.C. § 1964(c) ("The exception ... does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.").  The Amended Complaint does not state the date of Labella's conviction, and I instructed defendants to raise their statute of limitations arguments, if applicable, on motions for

summary judgment and not on the Phase I briefs.  (*See* Order Setting Briefing Schedule, DE 127).  Because the PSLRA bar does not apply to Labella, who is alleged to have been a participant of the BMIG/VFS Enterprise, Counts I and II remain viable as to him at this time.

C.   Supplemental Jurisdiction

Defendants ask the Court to dismiss the federal RICO claims, but to nonetheless exercise supplemental jurisdiction over Plaintiffs' state law claims and dismiss them on the merits as preempted by federal law.  Defendants concede that federal courts typically decline to exercise supplemental jurisdiction over state laws where, as here, the accompanying federal claims are dismissed prior to trial.  However, Defendants argue that supplemental jurisdiction should nonetheless be exercised because the state law claims are closely tied to the questions of federal policy, and because the doctrine of federal preemption may be implicated.  Defendants also argue that refiling of the claims in state court would waste judicial resources, as the state court must once again consider the same issues that this court has considered in connection with *Billing*.  On the other hand, Plaintiffs argue that if the federal claims are dismissed, I should decline to exercise supplemental jurisdiction because strong state law policies are at issue in this case.

Federal courts have supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a), which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Because there is no diversity between the parties,

Plaintiffs in this case must establish federal question jurisdiction over at least one count of the Amended Complaint. *Cf. Smith*, 238 Fed. Appx. at 455 (stating that because there was no diversity between the parties, the sole question was whether any claim arose under federal law as to allow the court to exercise supplemental jurisdiction).  Only then may I inquire into whether supplemental jurisdiction can be exercised over the state law claims.

Pursuant to 28 U.S.C. § 1331, district courts have original jurisdiction of "civil actions arising under the Constitution, laws or treaties of the United States."  A claim arises under the laws of the United States "only when the plaintiff's well-pleaded complaint raises issue of federal law."  *Brown v. Connecticut Gen. Life Ins. Co.,* 934 F.2d 1193, 1195 (11th Cir. 1991).  A possible defense involving a federal question does not generally create federal question jurisdiction.  *See Ervast v. Flexible Products Co.,* 346 F.3d 1007, 1012 (11th Cir. 2003).  Thus, it follows that a defendant may not remove a case to federal court based on a defense involving federal law.  A narrow exception to this rule is complete preemption, which exists when Congress has so completely preempted an area of the law that state law claims are considered converted into federal claims.  *Id.* (citing *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *Palmer v. Local 8285 USW*, 234 Fed. Appx. 884, 887 (11th Cir. 2007) ("The doctrine of complete preemption, however, exists as an exception to the well-pleaded complaint rule"); *Alyse v. Sprosty,* 06-21075, 2007 U.S. Dist. LEXIS 23043, **7-8 (S.D. Fla. March 29, 2007) (same).

Even if a court is satisfied that supplemental jurisdiction has been established, the court may decline to exercise it if: "(1) the claim raises a novel or complex issue of State law; (2) the claim substantially predominates over the claim or claims over which the district

court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or; (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c).  The Supreme Court has stated that "[w]hen federal laws claims have dropped out of the lawsuit in its early stages and only state law claims reaming, the federal court *should* decline the exercise of jurisdiction by dismissing the case without prejudice."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988) (emphasis added); *see also  L.A. Draper & Son v. Wheelabrator-Frye, Inc.,* 735 F.2d 414, 428 (11th Cir.1984) ("If the federal claim is dismissed prior to trial, [Supreme Court's precedent] strongly encourages or even requires dismissal of the state law claims")*; Champion v. Homa,* Case No. 03-275, 2008 WL 900967 (M.D. Ala. March 31, 2008) (declining to exercise supplemental jurisdiction over state law claims, including state law claims of securities fraud, after holding that the federal RICO claims were barred by the PSLRA); *Schneider v. KPMG LLP,* Case No. 04-55-Orl-31, 2004 U.S. Dist. LEXIS 27317, * 11 (M.D. Fla. April 12, 2004) (declining discretion to exercise supplemental jurisdiction over state law claims, including claims of fraud, breach of contract and deceptive and unfair trade practices, after concluding that the PSLRA barred the plaintiffs' federal RICO claims).  A Court shall "find substantial predominance when it appears that a state claim constitutes the real body of a case, to which the federal claim is only an appendage." *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 744 (11th Cir.  2006).

There is no question in this case that the federal RICO claims, Counts I-IV, arise under the laws of the United States so that federal question jurisdiction has been established, and that I may exercise supplemental jurisdiction over the state law claims,

Counts V-XV, because they are part of the same case or controversy.  However, I have dismissed with prejudice all of the claims over which I had original jurisdiction as to all but one defendant, have entered partial final judgment as to the federal claims, and the "complete preemption" exception to the well-pleaded complaint rule does not apply.[15]  *See, e.g., Humana Inc. v. Forsyth,* 525 U.S. 299 (1999) (Federal RICO does not proscribe state laws governing insurance permit); *Hill v. Marston*, 13 F.3d 1548, 1550 (11th Cir. 1994) (Georgia securities law not completely preempted by the federal securities laws, including the Securities Exchange Acts of 1933 and 1934); *Patterman v. Travelers, Inc.,* 11 F. Supp. 2d 1382, 1388 (S.D. Ga. 1997) (Georgia RICO statute not preempted by federal RICO statute).

Resolution of the argued basis for dismissal of the state law claims requires consideration of matters this Court has not addressed, and interpretation of several state laws.  "[C]onsiderations of practicality and comity counsel that a state judge is best equipped to resolve [state] claims."  *See Jacoboni v. KPMG*, 314 F. Supp. 2d 172, 1180-1181 (M.D. Fla. 2004).  I agree with Plaintiffs that strong state law policy is implicated in this case since a ruling that some of Florida's securities laws are preempted have a significant impact on the state's consumer protection laws.  Further, the state law issues substantially predominate over what remains of Counts I and II as to Defendant Labella and for which the Court has original jurisdiction.  Therefore, in my discretion, pursuant to 28 U.S.C. § 1367(c)(3), I decline to exercise supplemental jurisdiction over Plaintiffs' state

---

[15]

During oral argument, Defendants' counsel conceded that this case did not involve a situation of complete preemption.  (June 6, 2008 Hr'g Tr.).

34

law claims, and I thus dismiss them without prejudice, and remand them to the state court.

       D.    <u>Partial Final Judgment</u>

Despite the survival of Counts I and II as to Defendant Labella at this stage of the proceedings, pursuant to Federal Rule of Civil Procedure 54, I find that there is no just reason for delay and direct entry of final judgment as to Counts I-IV as plead against all other defendants.  Fed. R. Civ. P. 54 (b) ("When action presents more than one claim for relief ... or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay.").

The Eleventh Circuit has established a two-step analysis district courts must follow in determining whether a partial final judgment may properly be certified under Rule 54(b). *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007). The first step is to determine that the final judgment is in fact both "final" and a "judgment". *Id.* A decision is "final" if it is "an ultimate disposition of an individual claim [or individual party] entered in the course of a multiple claims action." *Id.* (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7  (1980)).  A decision is a "judgment" when it is a "a decision upon a cognizable claim for relief." *Id.*  The second step is to "determine that there is no 'just reason for delay' in certifying it as final and immediately appealable." *Id.* The second step is required because not all final judgments on individual claims and/or on individual parties should be immediately appealable.  *Id.* at 777-78.  Whether there is no just reason for delay is a decision within the district court's discretion.  *Id.* at 778, n. 5 (citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 437 (1956) ("[T]he District Court

may, by the exercise of its discretion in the interest of sound judicial administration, release for appeal final decisions upon one or more, but less than all, claims in multiple claims actions.").  In issuing a final partial judgment, the district court mus be mindful of "judicial administrative interests -- including the historic federal policy against piecemeal appeals -- and the equities involved." *Id.* at 778 (quoting *Sears, Roebuck & Co.,* 351 U.S. at 438 (internal quotations omitted)).

In this case, my decision that the PSLRA bars the federal RICO claims as to all but one defendant is a final judgment, as it is an ultimate decision that dismisses with prejudice Counts I-IV of the Amended Complaint as to all similarly situated defendants.  I further note that Counts I-IV are the only federal claims in this action, and I have remanded the remaining state law claims to state court.   The Eleventh Circuit has not had the opportunity to consider the important issue raised by the parties as to the PSLRA exception to the RICO statute, and I find no just reason for delaying its review.  Additionally, the remaining state law claims have not been considered by me, and the Eleventh Circuit's decision on the Federal RICO claims will not affect their adjudication in state court.

IV.   Conclusion

For the reasons discussed in this order, having reviewed the Amended Complaint, the motions to dismiss and related pleadings, the applicable case law and statutes, and having considered the parties' arguments, it is hereby ORDERED AND ADJUDGED:

1.   The Moving Financial Institutions' Motion to Dismiss [DE 134] is GRANTED in part.

2.   Zeccola's Motion to Dismiss [DE 135] is GRANTED in part.

3.   Tower Equities' Motion to Dismiss [DE 136] is GRANTED in part.

4.      Counts I-IV, the federal RICO claims, are DISMISSED with prejudice because they are legally barred, except as to Defendant Labella.

5.      On or before July 7, 2008, Plaintiffs shall file a Status Report informing the Court of whether they intend to proceed with their Federal RICO claims as to Defendant Labella. If Plaintiffs proceed with these claims, Mr. Labella may file a motion to dismiss within 45 days from the filing of the Status Report. If such motion is filed, Plaintiffs must file their response within 60 days of its filing. Labella's reply will be due 30 days thereafter.

6.      The remaining state law claims, Counts V-XV, are DISMISSED without prejudice as to all Defendants.

7.      The Clerk of Court shall remand the state law claims to the Clerk of the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida.

8.      All other pending motions are DENIED as moot and all hearings are CANCELLED.

9.      A partial final judgment in accordance with this Order will be issued separately.

DONE AND ORDERED in Chambers, at Miami, Florida, this 25th day of June, 2008.

_____
THE HONORABLE ALAN S. GOLD
U.S. DISTRICT JUDGE

cc:
U.S. Magistrate Judge Chris M. McAliley
Counsel of record
From chambers via U.S. Mail: Tonino Labella, *Pro Se;* John Black, *Pro Se*